**HAHN & HESSEN LLP**
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400
Mark T. Power, Esq.
Janine M. Figueiredo, Esq.

*Proposed Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- X
                                                                    :
**In re:**                                                          :    **Chapter 11**
                                                                    :
**Décor Holdings, Inc., *et al.*,**[1]                              :    **Case No. 19-71020 (REG)**
                                                                    :    **Case No. 19-71022 (REG)**
                                    **Debtors.**                     :    **Case No. 19-71023 (REG)**
                                                                    :    **Case No. 19-71024 (REG)**
                                                                    :    **Case No. 19-71025 (REG)**
                                                                    :
                                                                    :    **Joint Administration Requested**
------------------------------------------------------------------- X

## DECLARATION OF LEE SILBERMAN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Lee Silberman, being duly sworn, depose and state as follows:

1.      I am the Chief Executive Officer ("CEO") of Décor Holdings, Inc. and its

affiliated debtors and debtors-in-possession (collectively, the "Debtors"). I have served as

the Debtors' CEO since March 31, 2017. Prior to that, I was a senior Vice President of

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Décor Holdings, Inc. (4174); Décor Intermediate Holdings LLC (5414); The Robert Allen Duralee Group, Inc. (8435); The Robert Allen Duralee Group, LLC (1798); and The Robert Allen Duralee Group Furniture, LLC (2835). The corporate headquarters and the mailing address for the Debtors listed above is 49 Wireless Boulevard, Suite 150, Hauppauge, NY 11788. The Debtors also maintain a separate corporate office at 2 Hampshire Street, Suite 300, Foxboro, MA 02035.

Duralee Fabrics Company, where I was employed since May 14, 1979. In my capacity as CEO, I am generally familiar with the Debtors' day-to-day operations, business, financial affairs, and books and records. I am above 18 years of age and I am competent to testify.

2. In January 2019, the Debtors retained Timothy D. Boates as their Chief Restructuring Officer ("CRO") to assist the Debtors in their restructuring efforts. Mr. Boates is the President of RAS Management Advisors, LLC. I understand that his experience includes acting as the Chief Restructuring Officer, Interim CFO and/or the Restructuring Advisor for companies involved in a variety of industries both in and outside of Chapter 11. He has extensive experience in negotiating the sale of divisions and whole companies in complex transactions. Mr. Boates and I are working together to prepare for these chapter 11 filings in an effort to maximize the value of the Debtors' business and their assets for the benefit of all stakeholders.

3. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon (a) my personal knowledge, (b) my discussions with other members of the Debtors' management team, advisors, employees or other representatives of the Debtors (c) my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or (d) my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

4. On February 12, 2019 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. 101, *et*

*seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District

of New York.

     5.    Contemporaneously herewith, the Debtors have filed the following motions

and application (collectively, the "First Day Motions"):

    A.    Motion of the Debtors for Joint Administration of Related Chapter 11 Cases;

    B.    Application for an Order Appointing Omni Management Group, Inc. as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. 105(a), and E.D.N.Y. Administrative Order No. 658 *Nunc Pro Tunc* to the Petition Date;

    C.    Motion of the Debtors for an Order (1) Extending the Debtors' Deadline to File Schedules and Statements of Financial Affairs, (2) Authorizing the Debtors to File Consolidated Lists of the Debtors' Creditors and 30 Largest Unsecured Creditors, (3) Authorizing the Debtors to Mail Initial Notices, and (4) Authorizing the Debtors to use Prepetition Business Forms;

    D.    Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures;

    E.    Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System and (II) Maintain Their Existing Bank Accounts, (B) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (C) Granting Certain Other Related Relief;

    F.    Motion for Interim and Final Orders Authorizing the Debtors (I) to Pay or Honor (A) Prepetition Wages, Compensation, Employee Benefits, and Related Items, and (B) Prepetition Employee Payroll Taxes, Deductions, and Withholdings, and (II) to Continue the Employee Benefits in the Ordinary Course;

    G.    Motion of the Debtors for Interim and Final Orders (A) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance;

H. Motion for Interim and Final Orders Authorizing the Debtors (A) to Continue Insurance Policies, and (B) Pay Prepetition and Post-Petition Obligations in Respect Thereof;

I. Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees;

J. Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Shippers, Freight Forwarders, Carriers, and Similar Claimants;

K. Motion for Interim and Final Orders Authorizing the Debtors to Maintain Prepetition Customer Programs and Honor Prepetition Obligations in Respect Thereof; and

L. Motion of the Debtors for Entry of Interim And Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), and 364(E), and (B) Use Cash Collateral Pursuant to 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rules 4001(B) and (C).

6. In addition to the First Day Motions, the Debtors have filed (or intend to soon file) the following additional motions:

A. Debtors' Motion for Entry of (A) an Order (I) Approving Bid Procedures in Connection with the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter into Stalking Horse Agreements and Approving Certain Bid Protections, (III) Scheduling an Auction for and Hearing to Approve Sale of Assets, (IV) Approving Notice of Date, Time and Place for Auction and for Hearing on Approval of Sale, (V) Approving Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (VI) Approving Form and Manner of Notice Thereof, and (VII) Granting Related Relief; and (B) an Order Authorizing and Approving (I) the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Rights, Encumbrances, and Other Interests, (II) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Related Relief;

B. Application for an Order Authorizing the Debtors to Employ and Retain RAS Management Advisors, LLC to Provide the Debtors with

a Chief Restructuring Officer and Certain Additional Personnel *Nunc Pro Tunc* to the Petition Date;

C.      Application for an Order Authorizing the Retention and Employment of Hahn & Hessen LLP As Attorneys for the Debtors *Nunc Pro Tunc* to the Petition Date;

D.      Debtors' Application for Entry of an Order Authorizing the Employment and Retention of SSG Advisors, LLC as Investment Banker for the Debtors *Nunc Pro Tunc* to the Petition Date;

E.      Application for an Order Authorizing the Retention and Employment of Halperin Battaglia Benzji, LLP as Conflicts and Special Counsel for the Debtors *Nunc Pro Tunc* to the Petition Date;

F.      Motion of the Debtors to (A) Reject Certain Unexpired Leases of Non-Residential Real Property, and (B) Abandon *De Minims* Property in Connection Therewith; and

G.      Motion for an Order Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals.

## PRELIMINARY STATEMENT[2]

7.      I submit this Declaration, pursuant to E.D.N.Y. LBR 1007-4 and this Court's Guidelines for First Day Motions, in support of the Debtors' chapter 11 petitions and First Day Motions.  I am familiar with the content of each First Day Motion and believe that the relief sought therein allows the Debtors to fulfill their duties as debtors in possession, minimize the possible disruption that may be caused by the chapter 11 filings and achieve a successful reorganization. The facts set forth in each of the First Day Motions are incorporated herein by reference. Capitalized terms used but not defined in this Declaration shall have the meanings ascribed to such terms in the relevant First Day Motion.

8.      This Declaration, which is organized into three sections, provides an overview of the Debtors and the circumstances leading to the commencement of the

---

[2]    Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them elsewhere in this Declaration.

Debtors' chapter 11 cases. Section I describes the Debtors' overall business and their corporate structure and operations. Section II recounts the events preceding the bankruptcy filings. Section III affirms and incorporates facts that support the First Day Motions.

## I.    OVERVIEW OF THE DEBTORS' BUSINESS AND THEIR CORPORATE STRUCTURE AND OPERATIONS.

### A.    The Robert Allen Duralee Group of Companies

9.    The Robert Allen Duralee Group is the second largest supplier of decorative fabrics and furniture to the design industry in the United States.  It designs, manufactures and sells decorative fabrics, wall coverings, trimmings, upholstered furniture, drapery hardware and accessories for both residential and commercial applications. With over 30,000 sku's of fabric, trim, decorative hardware and furniture, the Group provides world class products and services to design professionals (giving them access, and the ability to buy, "to-the-trade-only" luxury home furnishings for their clients) and commercial customers. In addition to their own extensive product lines, the Robert Allen Duralee Group represents approximately six (6) other furnishing companies, including Paris Texas Hardware, The Finial Company, Clarke & Clarke, Thibaut and Byron & Byron.

10.    The Robert Allen Duralee Group maintains showroom premises located in major metropolitan cities across the United States and Canada, and an extensive worldwide agent showroom network that collectively service more than 30 countries around the globe. The Group offers more than 5,000 fabrics and 1,000 wall coverings, ranging from $20 to $600 retail. It has relationships with more than 100 mills from around the world. Every year the design studio creates new fabric collections consisting of as many as thirty designs per collection, each design available in a variety of colors. The studio also annually introduces extensive collections of passementerie tassels, braids, fringes, ropes and cords.

11.     For over 60 years, the Duralee Group has met and exceeded the needs of its customers by providing innovative and high quality home furnishing products. The Duralee Group's offerings are expansive—ranging from fabric and furniture to trim and drapery hardware. Its mission is to provide inspired fabric, furniture and home furnishings in order to bring design concepts to life. The Duralee Group has sold its products under the Duraleee Fabrics, Duralee Furniture, Duralee Drapery Hardware, Duralee Contract, Suburban Home, DF Monogram, Highland Court, Bailey & Griffin, Lulu DK, Clarke & Clarke and James Hare brands.

12.     The Robert Allen Group has been one of the world's largest designers of fine fabrics for the interior design trade, and recognized for over 75 years as a brand leader in its field. The Robert Allen Group has sold its products under the Robert Allen, Beacon Hill, Robert Allen Contract, and Robert Allen @ Home brands and is renowned for the Robert Allen Color Library, widely known as the first fine fabric collection to be designed by color.

## B.     Corporate History

13.     Décor is a privately-owned company organized and existing under the laws of the State of Delaware with headquarters in Hauppauge, New York. The issued and outstanding Class A Common Stock of Décor are held 60% percent by ACP Décor Holdings, Inc., 15% percent by me, Lee Silberman, 15% by Martin Rosenberger and 10% percent by Amy Benjamin. As will be discussed in greater detail below, the business of the Debtors now known as the Robert Allen Duralee Group is the result of a merger in March 2017 (the "Merger") that resulted in the combination of the Duralee business conducted by certain of the Debtors and their non-Debtor affiliates (the "Duralee Group") and the Robert Allen business conducted by certain of the Debtors and their non-Debtor affiliates (the

7

"Robert Allen Group", and together with the Duralee Group, the "Robert Allen Duralee Group").

14.    Notwithstanding their respective leadership in the home furnishing industry, in years leading up to the Merger, the Duralee Group and the Robert Allen Group both began to encounter financial difficulties as a result of a confluence of events and challenges, which taken together, had a negative impact on their overall performance. Like many industries, the textile industry has been hard hit by the significant decrease in consumer spending and was severely affected by the global economic downturn. As a result, the Debtors experienced declining sales and profitability over the last several years.

15.    In an effort to cut costs, realize efficiencies and combine operations under the leadership of strong management, in March 2017 the Duralee Group[3] and the Robert Allen Group consummated the Merger.

## C.    Organizational Structure

16.    As a result of the Merger, and as reflected in the organizational chart attached hereto as **Exhibit A**:

A.    Décor, a Delaware corporation, directly owns 100% of the interests in Décor Intermediate Holdings LLC, a Delaware limited liability company;

B.    Décor Intermediate Holdings LLC owns 100% of the interests in  The Robert Allen Duralee Group, Inc., a Delaware corporation, and  The Robert Allen Duralee Group LLC,  a Delaware limited liability company; and

C.    The Robert Allen Duralee Group LLC owns 100% of The Robert Allen Duralee Group Furniture, LLC[4]

---

[3]    Prior to the Merger, the Duralee Group reorganized in order to facilitate the transaction.

[4]    In addition, The Robert Allen Duralee Group, Inc. owns 100% of non-Debtor Robert Allen Fabrics (Canada) Ltd. and  The Robert Allen Duralee Group, LLC owns 100% of non-Debtors Suburban Home Fabrics (Shanghai) Trading Co., Ltd., Techstyle Contract Fabrics LLC, B. Berger Company LLC and  Gaetano Fabrics LLC, which are dormant entities.

## D.    The Debtors' Business Lines

17.    As discussed above and as reflected in the Debtors' organizational chart attached hereto as **Exhibit A**, the Debtors have three primary business lines: (a) selling decorative fabrics and furniture to interior designers; (b) providing decorative fabrics and fabricated products to hospitality customers, including hotels and resorts, and retail manufacturers who sell products to the trade and/or consumers; and (c) manufacturing custom-made furniture for both residential and commercial use.

## E.    The Debtors' Prepetition Capital Structure

18.    As part of the overall Merger transaction, the Debtors entered into that certain Amended and Restated Credit and Security Agreement, dated as of March 31, 2017 (as amended, modified or supplemented from time to time, the "Prepetition Senior Credit Agreement"), by and among The Robert Allen Duralee Group, Inc. and  The Robert Allen Duralee Group, LLC, as Borrowers, the guarantors that are party thereto (which, as of the Petition Date, include the remainder of the Debtors and certain other affiliates of the Debtors) (the "Senior Loan Guarantors" and together with the Borrowers, the "Senior Loan Parties"), the lenders party thereto from time to time (the "Senior Lenders"),  Wells Fargo Bank, National Association,  as Agent and Co-Collateral Agent ("Wells Fargo") and PNC Bank, National Association,  as Co-Collateral Agent ("PNC").

19.    As security for the payment of the obligations under the Prepetition Senior Credit Agreement, the Senior Loan Guarantors jointly and severally guaranteed the obligations thereunder.  Additionally, the Senior Loan Parties pledged as collateral first priority liens in all of their property (other than Excluded Property, as such term is defined in the Prepetition Senior Credit Agreement).  Additionally, pursuant to that certain Pledge

Agreement, dated March 31, 2017 (the "Senior Pledge Agreement"), the Senior Loan Parties pledged as collateral 100% of the equity interests in each of their subsidiaries.

20.    As of the Petition Date, the Senior Loan Parties' revolving credit secured debt obligations to the Senior Lenders under the Prepetition Senior Credit Agreement and related documents totaled approximately $23,779,615.57, together with interest, fees, costs and other expenses, together with outstanding letters of credit in the amount of $817,979.67 (the "Senior Debt Obligations").

21.    As part of the overall Merger transaction, the Debtors also entered into that certain Amended and Restated Term Note and Security Agreement, dated as of March 31, 2017 (as amended, modified or supplemented from time to time, the "Prepetition Junior Credit Agreement"), by and among The Robert Allen Duralee Group, Inc., as Borrower, the guarantors that are party thereto (which, as of the Petition Date, include the remainder of the Debtors and certain other affiliates of the Debtors) (the "Junior Loan Guarantors" and together with the Borrowers, the "Junior Loan Parties"), the lenders party thereto from time to time (the "Junior Lenders"), and Corber Corp., as Agent ("Corber").

22.    As security for the payment of the obligations under the Prepetition Junior Credit Agreement, the Junior Loan Guarantors jointly and severally guaranteed the obligations thereunder.  Additionally, the Senior Loan Parties pledged as collateral second priority liens in all of their property (other than Excluded Property, as such term is defined in the Prepetition Junior Credit Agreement).

23.    As of the Petition Date, the Junior Loan Parties' total secured debt obligations to the Junior Lenders under the Prepetition Junior Credit Agreement and related

documents totaled approximately $5,747,623, together with interest, fees, costs and expenses (collectively, the "Junior Debt Obligations").

24.     Wells Fargo, as agent, and the Junior Lenders are parties to an Amended and Restated Intercreditor and Subordination Agreement dated as of March 31, 2017, pursuant to which among other things, the Junior Debt Obligations are junior and subordinate to the Senior Debt Obligations.

## II.     EVENTS LEADING TO BANKRUPTCY AND CHAPTER 11 GOALS

25.     After the Merger, the Debtors implemented significant cost-cutting measures, reducing their annual costs by approximately $10-$12 million between the merger in March 2017 and November 2018.  The Debtors had difficulty, however, implementing certain other cost-cutting and integration initiatives post-Merger.  For example, the Debtors had difficulty outside of bankruptcy consolidating their separate redundant showroom spaces for Robert Allen and Duralee, which are located in the same Design Center buildings.  As a result, the Debtors continued to incur obligations for redundant lease space and had to retain extra sale personnel to occupy separate redundant showrooms.  There were also various software and hardware integration issues that slowed the process of merging the computer systems and websites of the merged companies that disrupted sales.  Further, due to a fundamental reduction of market size in the home furnishings market, sales plummeted industry wide and the Debtors were not spared.

26.     As a result of these and other factors, the Debtor's sales have fallen by approximately 14% for each of the past two years since the Merger. Unfortunately, the efforts of management to sustain the Debtors at their current reduced level of operations have been unavailing. The Debtors find themselves again in financial difficulty.

27.     Commencing in December 2018, the Debtors implemented even more aggressive cost cutting measures including further reductions in head count, closing redundant showrooms[5] and eliminating or reducing certain capital and other expenses. These additional cost cutting measures are projected to save an additional approximately $20 million in expenses on an annualized basis.  The Debtors currently have approximately 410 employees in their various locations in the United States, reduced from approximately over 725 employees at the time of the merger.

28.     In addition, as a result of delays in paying suppliers, the Debtors have experienced delays in fulfilling customer orders and have been threatened with various legal actions stemming mostly from contractual disputes. The Debtors do not have the liquidity to litigate or settle these actions.

29.     The Debtors are continuing to explore modifications to their business model, including closing duplicative showrooms, downsizing and scaling back operations, and eliminating unduly burdensome contracts and unexpired leases. Nonetheless, the Debtors have determined that they cannot effectuate such modifications to their business model on their own given the precipitous drop in revenue, their current cash crisis and large legacy obligations. These and other challenges caused the Debtors to seek protection under Chapter 11.

30.     Faced with a significant drop in revenue and related challenges, Debtors requires the breathing spell afforded by the automatic stay to protect and preserve assets for the benefit of their creditors. Prior to the commencement of the chapter 11 cases, the Debtors explored various alternatives to resolve their financial issues, including a going

---

[5]     The Debtors intend to seek authority to reject these redundant showroom leases promptly after the filing.

concern sale of their business. The Debtors have determined that a going concern sale is necessary to preserve their business, and is in the best interest of their estates and creditors. To fund operations during the chapter 11 cases, the Debtors intend to seek approval a debtor-in-possession financing facility. Such financing sources will enable the Debtors to ensure continuity of service to their valuable customer base, thus maximizing asset values for the benefit of their creditors and estate.

31.    By seeking bankruptcy protection, the Debtors will be able to protect, preserve and maximize the value of their assets and businesses for the benefit of the estate, their creditors and employees. This proceeding will enable the Debtors to transition their business to a financially sound status, maximize the value of the Debtors' long-term reputation and goodwill in the textile industry, provide continued employment to many of their valued employees, and sustain a significant and trusted partner for their agents and distributors around the globe.

## III.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

32.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions, which request various procedural and substantive forms of relief. The Debtors request that the First Day Motions described herein be granted as they constitute a vital part of the Debtors' ongoing restructuring efforts.

### A.    *Motion of the Debtors for Joint Administration of Related Chapter 11 Cases* (the "Joint Administration Motion")

62.    By the Joint Administration Motion, pursuant to Bankruptcy Rule 1015(b), the Debtors are seeking to jointly administer the Debtors' chapter 11 cases for procedural purposes only. The Debtors are further requesting that the Clerk of the Court make an entry on the docket of each of the Debtors' chapter 11 cases stating that the Debtors' cases have been consolidated for

13

administrative purposes and that all further docket entries shall be filed on the Debtors' primary
docket of Décor Holdings, Inc.

63.    I understand that Bankruptcy Rule 1015(b) authorizes this Court to order the joint
administration of the bankruptcy cases of a debtor and its affiliates. The Debtors are "affiliates," as
such term is defined in Bankruptcy Code § 101(2). Accordingly, this Court is authorized to grant the
relief requested in the Joint Administration Motion.

64.    I believe that the joint administration of the Debtors' chapter 11 cases is less
burdensome to all parties in interest than retaining eight separate dockets for each Debtor entity.
Joint administration will allow the Clerk of the Court to combine notices to creditors of the Debtors'
respective estates and other parties in interest. Joint administration will also enable parties in
interest in each of the above-captioned chapter 11 cases to be apprised of the various matters before
the Court in all of these cases. The Debtors seek joint administration of these chapter 11 cases on a
procedural basis only. Thus, no creditor's rights will be substantively or negatively affected by the
Debtors' requests.

65.    In order to avoid unnecessary duplication of pleadings, hearings, and service
requirements, I believe that the Debtors' chapter 11 cases should be jointly administered for
procedural purposes only.

B.    *Application for an Order Appointing Omni Management Group, Inc. as Claims and
Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), 11 U.S.C. 105(a), and
E.D.N.Y. Administrative Order No. 658 Nunc Pro Tunc to the Petition Date* (the
"Claims Agent Retention Application")

66.    The Debtors seek to retain Omni Management Group, Inc. ("Omni") as their claims
and noticing agent with respect to their chapter 11 cases in accordance with the terms and conditions
set forth in that certain Engagement Agreement dated as of February 1, 2019, by and between the
Debtors and Omni, effective *nunc pro tunc* to the Petition Date.

67.    I believe that the Debtors' selection of Omni as claims and noticing agent for these
cases has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C.*

14

*§ 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from other qualified claims and noticing agents to ensure selection through a competitive process. Specifically, the Debtors solicited proposals from Omni, Kurtzman Carson Consultants LLC ("KCC"), and Prime Clerk LLC ("Prime Clerk"). All three claims and noticing agents are nationally recognized and perform substantially similar services.

68.    It is my belief that Omni is highly qualified and will provide the necessary noticing, service, consultation and other services that the Debtors and their professionals will require in order to effectively manage these cases. The Debtors estimate that there are over 7000 creditors and parties in interest that must be noticed of various significant events during the course of these chapter 11 cases. Omni will relieve the Clerk or, in the alternative, the Debtors of managing this tremendous task. Omni will also manage the Debtors' claims process in these cases, thus alleviating the Debtors and their professionals of this substantial burden so that they can focus on the Debtors' sale or restructuring process.  As such, in view of the complexity of the Debtors' business and the number of anticipated claimants and parties in interest in these cases, I believe that Omni's services are necessary and in the best interests of the Debtors and all parties in interest. Accordingly, the Debtors' Claims Agent Retention Application should be approved.

**C.**    ***Motion of the Debtors for an Order (1) Extending the Debtors' Deadline to File Schedules and Statements of Financial Affairs, (2) Authorizing the Debtors to File Consolidated Lists of the Debtors' Creditors and 30 Largest Unsecured Creditors, (3) Authorizing the Debtors to Mail Initial Notices, and (4) Authorizing the Debtors to use Prepetition Business Forms* (the "Omnibus Relief Motion")**

69.    By the Omnibus Relief Motion, the Debtors are seeking various forms of relief in order to effectively manage their chapter 11 cases. Specifically, the Debtors are requesting: (i) an extension of the deadline for the Debtors to file their schedules of assets and liabilities and statements of financial affairs (collectively, the "Schedules and SOFAs") to forty-five (45) days following the Petition Date; (ii) authorization to file a single consolidated list and mailing matrix of the Debtors' creditors in satisfaction of the requirements of the Bankruptcy Code, Bankruptcy Rules,

and Local Rules; (iii) authorization to file a consolidated list of the Debtors' thirty (30) largest creditors; (iv) authorization to mail initial notices of these chapter 11 cases; and (v) authorization to use the Debtors' existing business forms.

70.     Given the complexity of these chapter 11 cases and the substantial amount of information that must be gathered, reviewed, and compiled, I believe that the Debtors and their professionals should be granted the forty-five day extension to file the Schedules and SOFAs.  The Debtors' professionals have expended significant time and effort preparing the Debtors for the filing of these chapter 11 cases. In light of the substantial demands placed upon the Debtors' personnel and the Debtors' professionals at this time, extending the deadline to file the Schedules and SOFAs will permit the Debtors to file the Schedules and SOFAs in the most complete and accurate manner possible while also addressing the various other issues that are occurring simultaneously in these chapter 11 cases.

71.     Allowing the Debtors to file a consolidated list of creditors and top thirty largest unsecured creditors will promote efficiency and minimize any unnecessary costs associated with filing multiple mailing matrices or creditor lists and multiple top creditor lists. The filing of multiple lists of creditors may cause confusion and unnecessary overlap with respect to notice and service procedures. In addition, the Debtors' creditors are substantially the same such that filing multiple lists would be duplicative.  The consolidated creditor and mailing list will provide sufficient notice to all creditors and parties in interest in these cases in the most efficient manner possible.

72.     Allowing the Debtors to use their existing business forms will also promote efficiency and the avoidance of incurring unnecessary costs to the detriment of the Debtors' estates. Requiring the Debtors to replace their existing checks, letterhead, and other forms (collectively, the "Business Forms") with forms containing a "Debtor in Possession" designation will not serve any beneficial purpose given that all of the Debtors' creditors will be put on notice of these chapter 11 cases by direct mail, and through nation-wide publication of the commencement of the Debtors' cases. Requiring the Debtors to replace their Business Forms at this time would force the Debtors to bear a

significant expense where the Debtors have limited resources at their disposal. Parties that continue to conduct business with the Debtors will undoubtedly be aware of the Debtors status as a debtor in possession such that alteration of the Business Forms is not necessary at this time.

73.      Based upon the above, I believe that the relief requested in the Omnibus Motion is in the best interests of the Debtors, their creditors, and all other parties in interest, and will enable the Debtors to successfully operate their business during these chapter 11 cases with limited disruption.

## D.    *Motion for an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* (the "Case Management Motion")

74.      By the Case Management Motion, the Debtors are seeking to establish procedures which will simplify and also clarify the process for filling motions and other pleadings, serving such pleadings, and setting omnibus hearing dates. The procedures established by the Case Management Motion (the "Case Management Procedures") are in the best interests of all parties in interest in these chapter 11 cases. Granting the Case Management Motion will allow the Debtors to establish clear timelines for requests for relief and will generally provide for electronic filing and service, thus promoting the smooth and efficient administration of these chapter 11 cases. The Debtors also propose in their Motion to maintain an updated Master Service List, which will ensure that all required parties receive notice of relevant matters that occur in these cases. The Master Service List will simplify and crystalize the service process for all parties and limit any confusion that may have otherwise occurred.

75.      Given the substantial burdens placed upon the Debtors and their professionals by the commencement of these cases, establishing clear notice and filing procedures will help alleviate any confusion that may otherwise arise. Moreover, allowing the Debtors to schedule omnibus hearing dates upon consultation with the Court will allow the Debtors and the Court to request multiple outstanding motions and other requests in a consolidated, time-efficient manner.  Therefore, the relief requested in the Case Management Motion should be granted.

17

**E.** **Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue Using Their Existing Cash Management System and (II) Maintain Their Existing Bank Accounts, (B) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (C) Granting Certain Other Related Relief (the "Cash Management Motion")**

76. By the Cash Management Motion, the Debtors are seeking the authority to continue utilizing their currently existing, company-wide cash management system (the "Cash Management System") in the ordinary course of business, which includes the usage of the Debtors' current bank accounts and credit card accounts.

77. The Debtors' Cash Management System, which is described in detail in the Cash Management Motion, is an intricate system that allows the Debtors to operate their business on a daily basis. The Cash Management System allows the Debtors to, among other things, control, transfer and distribute corporate funds in the ordinary course of business to facilitate transactions and satisfy outstanding obligations. Through the Cash Management System, the Debtors also receive cash from their non-Debtor foreign subsidiary located in Canada, which receipts are used to help satisfy the Debtors' obligations to their Senior Lenders.

78. Continuation of the Cash Management System is essential not only to the Debtors' ongoing operations, but also to the Debtors' restructuring or sale efforts during these chapter 11 cases. Without the Cash Management System, the Debtors will be unable to conduct business in the ordinary course. Additionally, implementing a replacement cash management system would be exceedingly challenging, time consuming, and costly. Any disruption in the Debtors' current operations would be exceedingly problematic at this time given the Debtors' current financial state and the limited assets available to the Debtors and their estates.

79. I believe that the Debtors' transition into the chapter 11 process will be far more efficient and cost-effective if the Debtors are permitted to continue using their Cash Management System and related bank accounts as they existed prior to the Petition Date. Therefore, the Cash Management Motion should be granted.

**F.**    ***Motion of the Debtors for Interim and Final Orders (A) Prohibiting Utility Companies From Discontinuing, Altering, or Refusing Service, (B) Deeming Utility Companies to Have Adequate Assurance of Payment, and (C) Establishing Procedures for Resolving Requests for Additional Adequate Assurance*** **(the "<u>Utilities Motion</u>")**

80.    Through its Utilities Motion, the Debtors are requesting that all companies providing

necessary utility services to the Debtors (collectively, the "<u>Utility Companies</u>")[6] be prohibited from

altering or refusing service due to the commencement of the chapter 11 cases, and to continue

providing such services throughout the course of these cases. In exchange for their services, the

Debtors propose to establish a segregated bank account (the "<u>Deposit Account</u>") for the purposes of

providing the Utilities Companies with adequate assurances of payment throughout the course of

these cases. The Debtors propose to deposit approximately 50% of their aggregate monthly costs

attributable to services provided by the Utility Companies into the Deposit Account. To the extent

the Debtors fail to satisfy any outstanding obligations to a Utility Company, the Utility Company

may submit a "Draw Request" to the Debtors and their affiliated bank to request a withdrawal from

the Deposit Account for the outstanding amounts owed.  To the extent the request is valid and the

Debtors do not satisfy their outstanding obligations to the Utility Company within five days from the

date of such request, the Utility Company's Draw Request will be honored in amount necessary to

satisfy the Debtors' outstanding obligations to such Utility Company. The Debtors will take

reasonable steps thereafter to replenish the Deposit Account.

81.    I believe that uninterrupted utility services are necessary and essential to the Debtors'

ongoing business operations and restructuring or sale efforts. Utility services are required for the

Debtors to continue their business in the ordinary course, and thus uninterrupted services is

necessary for a successful resolution of these cases. The fully funded Deposit Account will provide

the Utility Companies sufficient assurance of payment going forward. Thus, the Court should grant

the Debtors' Utilities Motion.

---

[6]    A list of the Debtors' Utility Companies is attached to the Utilities Motion as <u>Exhibit A</u>.

**G.**    ***Motion for Interim and Final Orders Authorizing the Debtors (I) to Pay or Honor (A) Prepetition Wages, Compensation, Employee Benefits, and Related Items, and (B) Prepetition Employee Payroll Taxes, Deductions, and Withholdings, and (II) to Continue the Employee Benefits in the Ordinary Course* (the "<u>Employee Wages Motion</u>")**

82.    By the Employee Wages Motion, the Debtors are seeking to pay certain prepetition wages and compensation as well as to maintain and continue their employee benefits programs in the ordinary course and satisfy all prepetition obligations in connection therewith. The Debtors are also seeking to pay all prepetition payroll and withholding taxes to the extent that such taxes have accrued and will become due and owing postpetition. Finally, the Debtors are requesting authorization to remit any funds withheld on their employees' behalves regarding any garnishments and deductions to the appropriate third parties. As of the Petition Date, the Debtors employ approximately 400 persons, including salaried, hourly and commission-based employees (collectively, the "<u>Employees</u>").

83.    Employees have earned and accrued wages which relate to services rendered prior to the Petition Date, but have not yet become due and payable. Moreover, certain deductions and withholdings have been made from Employees' paychecks that have not remitted to the proper third parties. The Debtors' workforce is largely reliant on their compensation to finance their daily lives and activities. If the Debtors are not permitted to continue compensating their Employees and continuing their benefits programs in the ordinary course, the Debtors' Employees may in many cases suffer extreme hardship. At a minimum, if not paid in a timely manner, many Employees will begin to seek alternative opportunities for employment. The Employees are an absolutely necessary component of the Debtors' day-to-day operations, and a successful chapter 11 process will be significantly more difficult to achieve if the Debtors' workforce is not committed to staying employed with the Debtors during this critical time. Moreover, if not permitted to satisfy any prepetition payroll tax obligations, the Debtors may become liable for fines and penalties which will further diminish the Debtors' already limited resources in these cases.

84.     Given the vital role the Employees play in the Debtors' ongoing business operations
and given the substantial hardship that will stem from failing to pay any Employees for work which
has already been performed, I respectfully submit that the Employee Wages Motion should be
granted in its entirety. The Employee Wages Motion is a critical element of the Debtors' efforts to
preserve value for their estate and creditors, and will give the Debtors the greatest likelihood of
retaining their Employees during these chapter 11 cases.

**H.     *Motion for Interim and Final Orders Authorizing the Debtors (A) to Continue Insurance Policies, and (B) Pay Prepetition and Postpetition Obligations in Respect Thereof* (the "Insurance Motion")**

85.     The Debtors are requesting in the Insurance Motion the authority to maintain and
continue their insurance policies and their premium obligations for such policies as they become due
in the ordinary course on a postpetition basis. The Debtors seek further authority to renew or obtain
replacement coverage for any policies that lapse during the course of these chapter 11 cases. The
Debtors currently maintain approximately 12 insurance policies (collectively, the "Insurance
Policies") which provide various forms of coverage so that the Debtors can operate their business
and protect against various forms of substantial financial loss. In order to free up available capital,
the Debtors have entered into a premium finance agreement with First Insurance Funding, Inc.,
which finances the Debtors' premium obligations for various Insurance Policies (the "Premium
Finance Agreement"). The Debtors request authorization to continue honoring their obligations
under the Premium Finance Agreement, including making all installments on a timely basis and
paying related costs as necessary.

86.     The Insurance Policies are a required and necessary component of the Debtors daily
operations and, as such, I believe that the relief requested in the Motion should be granted in its
entirety. Maintaining proper insurance coverage is required under the Office of the United States
Trustee Operating Guidelines, and various state and federal laws under which the Debtors operate.
Given these requirements, continuing the Insurance Policies is essential to the Debtors' business,

and thus the Debtors' reorganization or sale efforts. The Insurance Policies form the basis upon which the Debtors conduct all of their operations as maintaining the Insurance Policies is a requirement under many of their most important agreements, including their prepetition credit agreement and debtor in possession financing agreement. Given that these agreements are essential to the Debtors continue operations, complying with the insurance coverage component of such agreements is also a necessity. The Debtors cannot afford to let any Insurance Policies lapse at any time during these Chapter 11 Cases.

## I.    *Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees* (the "Taxes Motion")

87.    By the Taxes Motion, the Debtors are seeking authorization to pay or otherwise satisfy all prepetition obligations for incurred and outstanding taxes and related fees that are currently due as of the Petition Date and as such taxes and fees become due and owing on a postpetition basis. In the ordinary course of business, the Debtors incur sales and use taxes, income taxes, personal and real property taxes, business fees, and other taxes and fees (collectively, the "Taxes and Fees"), which are payable at various monthly, quarterly, and annual intervals. The Debtors also contract with a third-party service provider who aids the Debtors in calculating and remitting sales and use taxes for certain Debtor entities.

88.    I believe that paying the Prepetition Taxes and Fees is necessary to the Debtors' ability to continue doing business in the ordinary course. If certain Taxes and Fees are not paid in a timely manner, certain taxing authorities or other governmental authorities could suspend the Debtors' ability to conduct business in certain jurisdictions. The applicable taxing authorities could also initiate audits, as well as impose penalties and fines on the Debtors or charge interest on outstanding amounts owed. The Debtors cannot afford the imposition of unnecessary fines or penalties at a time where resources are already limited. In addition, in certain instances, failure to pay the Taxes and Fees could open up the Debtors' directors and officers to personal liability. The Debtors require their upper management's full attention on, and dedication to, the Debtors and their

ongoing operations at this time. Any imposition of personal liability for unpaid Taxes and Fees would necessarily distract the Debtors' directors and officers from their daily tasks, which would negatively impact the Debtors' ability to conduct business during these cases. Further, a substantial portion of the prepetition Taxes and Fees will be afforded priority status under the Bankruptcy Code, and thus general unsecured creditors will not be negatively affected by the Debtors' payment of the Taxes and Fees at this time.

89.     Given the detrimental impact failing to pay the Taxes and Fees would have on the Debtors and their estates, I believe that granting the relief requested in the Taxes Motion is warranted. All parties in interest in these chapter 11 cases will be best served by permitting the Debtors to satisfy their outstanding obligations for the Taxes and Fees.

## J.     *Motion for Interim and Final Orders Authorizing the Debtors to Pay Certain Shippers, Freight Forwarders, Carriers, and Similar Claimants* (the "Shippers Motion")

90.     By the Shippers Motion, the Debtors are requesting authority to maintain their current business relationships with certain shippers, freight forwarders, movers, and drop shippers (collectively, the "Shippers") who have been deemed critical to the Debtors' ongoing operations. The Shippers are critical to the Debtors' business in that they transport the Debtors' goods and finished products on a daily basis so that the Debtors can complete their customers' orders in a timely fashion. The Shippers also import the Debtors' raw materials, including fabrics and material for making furniture, such that the Debtors can create finished products and fulfill their customers' orders. The Debtors rely heavily on the Shippers' services and without the Shippers the Debtors' most valuable customer relationships would be jeopardized as the Debtors' would not be able to comply with their customers' demands.

91.     In order to maintain their relationships with the Shippers, the Debtors seek the authority to pay the Shippers' prepetition claims. In exchange for paying a Shippers' prepetition claim, the Debtors propose that the Shippers be required to execute a "Trade Terms Agreement" which, among other things, requires the Shipper to provide services to the Debtors on the same or

better terms that existed between the parties in the twelve months preceding the Petition Date. The Shipper will also be required to remove any liens the Shipper asserted on the Debtors' goods on account of the Shipper's prepetition claims.

92.     The Debtors' relationships with the Shippers are essential for the Debtors to maintain their operations during these cases. Without the Shippers' services, the Debtors will not be able to comply with their current obligations to their customers; nor will they be able to accept any new orders based upon their inability to ship finished goods. Further, at any given time, the Shippers are in possession of a substantial portion of the Debtors' goods and therefore may assert possessory liens upon the Debtors' goods if not paid in accordance with past practice. Even if the Shippers' do not assert liens upon the Debtors' goods, simply withholding the goods or failing to deliver the goods in a timely manner will severely disrupt the Debtors ongoing operations. The Debtors cannot afford any disruptions in their supply and distribution systems at this time, and, therefore, I believe the Court should grant the relief requested in this Motion.

## K.     *Motion for Interim and Final Orders Authorizing the Debtors to Maintain Prepetition Customer Programs and Honor Prepetition Obligations in Respect Thereof* (the "Customer Programs Motion")

93.     In the ordinary course of business, the Debtors engage in certain sales practices that are designed to maximize their profitability and sales opportunities. These sales practices include rebate programs, prepayment programs, and free shipping programs, as detailed in the Customer Programs Motion (collectively, the "Customer Programs"). The Customer Programs give the Debtors a competitive advantage over their competition and engender loyalty among the Debtors most valuable customer base.

94.     As detailed in the Customer Programs Motion, the Debtors believe that continuation of the Customer Programs is necessary to avoid the immediate and irreparable harm that would result from the failure to do so. If the Debtors are not permitted to honor their obligations under the Customer Programs, the Debtors' would risk causing a loss of goodwill with their most valuable

24

customers and would impair the value of the Debtors' business. Honoring these obligations is essential to the Debtors' efforts to maintain their customer relationships, continue to generate sales, and maximize the value of their estates through the sale process.

95.     Accordingly, I respectfully submit that the Customer Programs Motion be granted.

**L.      *Motion of the Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(C)(1), 364(C)(2), 364(C)(3), 364(D)(1), and 364(E), and (B) Use Cash Collateral Pursuant To 11 U.S.C. § 363, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363, and 364, and (III) Scheduling Final Hearing pursuant to Bankruptcy Rules 4001(B) And (C)* (the "DIP Financing Motion")**

96.     By the DIP Financing Motion, the Debtors request, pursuant to sections 105, 361, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-5 of the Local Bankruptcy Rules for the Eastern District of New York (the "Local Rules"), for entry of an interim order on an expedited basis (the "Interim Order"), substantially in the form annexed thereto as **Exhibit A**, and a final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (i) authorizing the Debtors to (a) obtain post-petition financing in the form of a revolving credit and letter of credit facility in accordance with the terms and conditions set forth in the Prepetition Senior Credit Agreement, as ratified and amended by that certain Ratification and Amendment, dated as of February 12, 2019 (the "Ratification Agreement"), a copy of which is attached to the DIP Financing Motion as **Exhibit B** (as amended, supplemented or otherwise modified from time to time in accordance with the terms and conditions set forth in the Interim Order, the "Credit Agreement"), and (b) use Cash Collateral (as defined therein), (ii) granting liens and

providing super-priority administrative expense status to DIP Lenders (as defined therein), (iii) granting adequate protection to the Debtors' prepetition secured lenders, (iv) scheduling a final hearing pursuant to Bankruptcy Rule 4001, and (v) granting related relief.

97.    The DIP Facility consists of a $30,000,000 revolving credit facility, up to $13,000,000 of which the Debtors are seeking on an interim basis, on the terms set forth in the DIP Credit Agreement, the pertinent terms of which are set forth in the DIP Financing Motion. The proceeds of the DIP Facility will be used to pay operating expenses and the costs and expenses of administering these chapter 11 cases subject to and in accordance with a Budget and subject to entry of a final order approving the DIP Facility. The DIP Facility contemplates a "roll up" of the prepetition Senior Debt Obligations upon entry of the Final DIP Order (the "Roll-Up"). The DIP Lenders would not have agreed to provide the DIP Facility without the Roll-Up.

98.    In the ordinary course of business, the Debtors require cash on hand and cash flow from their operations to fund their liquidity needs and operate their businesses. In addition, the Debtors require access to sufficient liquidity to fund these chapter 11 cases while working towards a potential sale transaction.  Post-Petition financing, in addition to the use of cash collateral, is necessary in order for the Debtors to have access to sufficient liquidity to maintain ongoing day-to-day operations, ensure proper servicing of customers post-petition, and fund working capital needs. Absent post-petition financing and the use of cash collateral, the Debtors will be forced to wind-down their operations due to a lack of funds. I believe that it is imperative that the Debtors have access to sufficient liquidity to avoid imminent irreparable harm and successfully consummate a sale transaction.

99.     Representatives of the Debtors contacted one other potential third party lender. However, since the Prepetition Credit Facility is in default and the Debtors have no other unencumbered assets to use as additional collateral, it is clear that as a practical matter, no other entity would be willing to provide financing on terms more favorable than those being provided by the DIP Lenders. The DIP Facility adequately addresses the Debtors' working capital needs, and the DIP Facility will provide the Debtors' various constituencies, including customers, employees, and vendors with confidence in the Debtors' ability to maintain operations while working towards a sale.

100.     The Interim Order also sets forth certain stipulations and agreements by the Debtors regarding, inter alia, among other things, the validity, perfection, and amount of liens held by the Senior Lenders and the Debtors' obligations under the Prepetition Senior Credit Agreement. Each of the stipulations and agreements set forth in the Interim Order are true and correct to the best of my knowledge.

101.     I believe that the relief requested in the DIP Financing Motion is in the best interests of the Debtors, their estates and their creditors, and absent such relief, the Debtors will experience immediate and irreparable harm and their reorganization efforts will be jeopardized.

## **Schedules Pursuant To E.D.N.Y. LBR 1007-4**

102.     Attached hereto and incorporated herein by reference are various schedules setting forth information required under E.D.N.Y. LBR 1007-4. Capitalized terms used in the attached schedules that are not otherwise defined therein shall have the meanings ascribed to them in this Declaration.

## CONCLUSION

For all the foregoing reasons, I respectfully request that the Court grant the relief requested in the First Day Motions. I reserve the right to supplement and/or amend this Declaration with testimony and/or exhibits.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 12, 2019                    */s/ Lee Silberman*

                                        Lee Silberman
                                        Title: Chief Executive Officer

## SCHEDULE 1[1]

Pursuant to E.D.N.Y. LBR 1007-4(a)(i), the Debtors are not small business debtors within the meaning of Bankruptcy Code § 101(51D).

---

[1]    Capitalized terms used in these schedules that are not otherwise defined herein shall have the meanings ascribed to them in the *Declaration of Lee Silberman in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"). The information required by E.D.N.Y. LBR 1007-4(a)(ii) is set forth in the body of the First Day Declaration.

## SCHEDULE 2

### <u>List of Committees Formed Prior to the Petition Date</u>

Pursuant to E.D.N.Y. LBR 1007-4(a)(iv), and to the best of the Debtors' knowledge, no committees were organized prior to the Petition Date.

## SCHEDULE 3

### Consolidated List of the Holders of the
### Thirty (30) Largest Unsecured Claims on a Consolidated Basis

Pursuant to E.D.N.Y. LBR 1007-4(a)(v) and in conjunction with the Court's Guidelines for First Day Motions (which allows the Debtors to file a consolidated list of the Debtors' 30 largest unsecured creditors), I incorporate by reference the list of the holders of the thirty (30) largest unsecured claims against the Debtors on a consolidated basis, excluding insiders, which is attached to the Debtors' chapter 11 petitions (the "Consolidated Top 30 List").

The information contained in the Consolidated Top 30 List shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed in the Consolidated Top 30 List is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth in the Consolidated Top 30 List and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The Consolidated Top 30 List includes estimates of outstanding claim amounts as of the Petition Date.

# SCHEDULE 4

## Consolidated List of the Holders of the Five (5) Largest Secured Claims

Pursuant to E.D.N.Y. LBR 1007-4(a)(vi), the following lists the creditors holding, as of the Petition Date, the five (5) largest secured, non-contingent claims against the Debtors, on a consolidated basis, excluding claims of insiders defined in 11 U.S.C. § 101.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt, including the right to challenge any lien. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

In addition to the parties listed below, the Debtors may have unliquidated and/or contingent claims as a result of parties asserting a security interest against the Debtors' assets through UCC filings.

| | Creditor | Contact, Mailing Address & Email Address (if available) | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 1. | Wells Fargo Bank, N.A., as Agent | Wells Fargo Bank, N.A.<br>One Boston Place<br>20th Floor<br>Boston, MA 02108<br>Attn: Daniel Bolger<br>Email:<br>Daniel.J.Bolger@WellsFargo.com | Revolver Loan: Approximately $23,780,000<br><br>Letter of Credit: Approximately $818,000 | Collateral: First lien on substantially all assets of the Debtors<br><br>Collateral Value: Uncertain |
| 2. | Corber Corp., as Agent | Corber Corp.<br>61 south Paramus Road<br>Suite 278<br>Paramus, NJ 07652<br>Attn: Jeffrey A. Cordover<br>Email: jcordover@corbercorp.com | Approximately $5,747,623 | Collateral: Second lien on substantially all assets of the Debtors<br><br>Collateral Value: Uncertain |

|  | Creditor | Contact, Mailing Address & Email Address (if available) | Amount of Claim | Collateral Description and Value |
|---|---|---|---|---|
| 3. | Cisco Systems Capital Corporation | Cisco Systems Capital Corporation<br>7025-3 Kit Creek Road<br>M/S RTP 3L/2<br>Research Triangle Park, NC 27709<br>Attn: Lori Simpson<br>Email: losimpso@cisco.com | Approximately $137,800 | Collateral: Certain computer hardware equipment, as set forth in the applicable financing statement<br><br>Collateral Value: Uncertain |
| 4. | CIT Bank, N.A. | CIT Bank, N.A.<br>10201 Centurion Parkway North<br>6th Floor<br>Jacksonville, FL 32256 | Approximately $106,000 | Collateral: Certain HVAC equipment, as set forth in the applicable financing statement<br><br>Collateral Value: Uncertain |
| 5. | Key Equipment Finance | Key Equipment Finance<br>1000 S. McCaslin Boulevard<br>Superior, CO 80027 | Approximately $76,000 | Collateral: Certain HVAC equipment, as set forth in the applicable financing statement<br><br>Collateral Value: Uncertain |

# SCHEDULE 5

## Summary of the Debtors' Assets and Liabilities

Pursuant to E.D.N.Y. LBR 1007-4(a)(vii), the following financial data (unaudited and subject to change) is the latest available information and reflects the Debtors' financial conditions, as consolidated as of the November 30, 2018.

The following financial data shall not constitute an admission of liability by the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

| Décor Holdings, Inc.<br>Pro Forma Balance Sheet<br>November 30, 2018<br>(Amounts in thousands) | Estimated Balances at<br>November 30, 2018 |
|---|---|
| **ASSETS** | |
| **Current Assets:** | |
| Cash & Cash Equivalents | $1,378 |
| Net Accounts Receivable | $11,688 |
| Inventory | $39,938 |
| Other Current Assets | $976 |
| **Total Current Assets** | **$53,979** |
| | |
| **Long Term Assets:** | |
| Capitalized Sampling | $15,332 |
| Patents & Trademarks | $25 |
| Security Deposits | $889 |
| Prepaid LT Tax Bond | $8 |
| Other Long Term Assets | $467 |
| Property and Equipment | $24,136 |
| Total Depreciation | $(17,088) |
| Net Property and Equipment | $7,048 |
| **Total Long Term Assets** | **$23,768** |
| | |
| **Total Assets:** | **$77,748** |
| | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | |
| **Current Liabilities:** | |
| Loan Payable – Bank | $26,493 |
| Capital Lease – Current | $243 |
| Accounts Payable | $20,365 |
| Customer Deposits | $7,057 |
| Accrued Compensation | $1,540 |

| | |
|---|---:|
| Accrued Interest Payable | $68 |
| Accrued Income Tax Payable | $(37) |
| Other Accrued Liabilities | $3,299 |
| **Total Current Liabilities** | **$59,028** |
| | |
| **Long Term Liabilities:** | |
| Long Term Securitized Loan | $5,674 |
| Long Term Capital Lease | $249 |
| Deferred Rent | $2,543 |
| Long Term Other | $1,402 |
| Deferred Gain on RE | $1,491 |
| **Total Long Term Liabilities** | **$11,359** |
| | |
| **Total Liabilities:** | **$70,387** |
| | |
| **Shareholders' Equity:** | |
| Stock Par Value | $2 |
| Paid in Capital & Retained Earnings – Beginning | $13,433 |
| Net Income Current Year | $(7,457) |
| Paid in Capital & Retained Earnings – Ending | $5,976 |
| Currency Translation Adjustment | $1,382 |
| **Total Shareholders' Equity** | **$7,360** |
| | |
| **Total Liabilities & Shareholders' Equity:** | **$77,747** |

## SCHEDULE 6

## <u>Schedule of Publicly Held Securities</u>

Pursuant to E.D.N.Y. LBR 1007-4(a)(viii), there are no shares of the Debtors' stock, debentures and/or other securities that are publicly held.

## SCHEDULE 7

### <u>List of Debtors' Property In the Possession of Third Parties</u>

Pursuant to E.D.N.Y. LBR 1007-4(a)(ix), the Debtors represent that the Debtors do not have property that is in the possession or custody or any custodian, public officer, mortgagee, pledgee, assignee or rents, or secured creditor, or agent for such entity.

## SCHEDULE 8

## Summary of Property From Which the Debtors Operate Their Businesses

Pursuant to E.D.N.Y. LBR 1007-4(a)(x), the following lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

The following list is solely intended to provide the Court with information as to the premises from which the Debtors operate their businesses, and includes the locations of the Debtors' various showrooms. The Debtors reserve all rights, including, but not limited, under section 365 of the Bankruptcy Code. The Debtors make no admission as to the contractual relationship or enforceability of any lease agreement and further reserve all rights in connection therewith.

| Debtor | Premises Address | Leased/Owned |
|---|---|---|
| The Robert Allen Duralee Group, Inc. | 351 Peachtree Hill Ave NE<br>Suite 401<br>Atlanta, GA 30305 | Leased |
| The Robert Allen Duralee Group, Inc. | One Design Center Place<br>Suite 317<br>Boston, MA 02210 | Leased |
| The Robert Allen Duralee Group, Inc. | Merchandise Mart<br>222 Merchandise Mart Plaza<br>Suite 633<br>Chicago, IL 60654 | Leased |
| The Robert Allen Duralee Group, Inc. | Dallas Design District<br>1025 North Stemmons Freeway<br>Suite 747<br>Dallas, TX  75207 | Leased |
| The Robert Allen Duralee Group, Inc. | 317 W High Avenue<br>Room 780<br>High Point, NC 27260 | Leased |
| The Robert Allen Duralee Group, Inc. | 5120 Woodway Drive<br>Suite 1000<br>Houston, TX  77056 | Leased |
| The Robert Allen Duralee Group, Inc. | 8687 Melrose Avenue<br>Suite B499<br>West Hollywood, CA 90069 | Leased |
| The Robert Allen Duralee Group, Inc. | D & D Building<br>979 Third Avenue<br>Room 305<br>New York, NY 10022 | Leased |
| The Robert Allen Duralee Group, Inc. | 220 Crossways Park Drive West<br>Woodbury, NY 11797 | Leased |
| The Robert Allen Duralee Group, Inc. | 34 South 11th St<br>Suite 306<br>Philadelphia, PA 19107 | Leased |
| The Robert Allen Duralee Group, Inc. | Michigan Design Center<br>1700 Stutz Drive<br>Suite 28<br>Troy, MI 48064 | Leased |

| Debtor | Premises Address | Leased/Owned |
|---|---|---|
| The Robert Allen Duralee Group, Inc. | 1099 14th St., NW<br>Suite 410<br>Washington , DC 20005 | Leased |
| The Robert Allen Duralee Group, Inc. | 80 Broad Street<br>Suite 1000 & 1100<br>New York, NY 10004 | Leased |
| The Robert Allen Duralee Group, Inc. | 2 Hampshire Street<br>Suite 300<br>Foxboro, MA 02035 | Leased |
| The Robert Allen Duralee Group, Inc. | 50 Peachtree Boulevard<br>Gaffney, SC 29341 | Leased |
| The Robert Allen Duralee Group, LLC | Atlanta Decorative Arts Center<br>351 Peachtree Hills Ave, NE<br>Suite 125<br>Atlanta, GA  30305 | Leased |
| The Robert Allen Duralee Group, LLC | Boston Design Center IDB<br>One Design Center Place<br>Suite 428<br>Boston, MA 02210 | Leased |
| The Robert Allen Duralee Group, LLC | Merchandise Mart<br>222 Merchandise Mart Plaza<br>Suite 624<br>Chicago, IL  60654 | Leased |
| The Robert Allen Duralee Group, LLC | Dallas Design District<br>1250 Slocum Street<br>Suite 742<br>Dallas, TX  7520 | Leased |
| The Robert Allen Duralee Group, LLC | Design Center of America<br>1855 Griffin Road<br>#C-100<br>Dania Beach, FL  33004 | Leased |
| The Robert Allen Duralee Group, LLC | Market Square Tower<br>305 West High Street<br>#630<br>High Point, NC 27260 | Leased |
| The Robert Allen Duralee Group, LLC | Decorative Center<br>5120 Woodway Drive<br>Suite 132 & 130<br>Houston, TX  77056 | Leased |
| The Robert Allen Duralee Group, LLC | Pacific Design Center<br>8687 Melrose Avenue<br>#B-601<br>Los Angeles, CA  90069 | Leased |
| The Robert Allen Duralee Group, LLC | 146-150 West 25th Street<br>11th Floor<br>New York, NY 10001 | Leased |
| The Robert Allen Duralee Group, LLC | D & D Building<br>979 Third Ave<br>Suite 620<br>New York, NY 10022 | Leased |
| The Robert Allen Duralee Group, LLC | San Francisco Design Center<br>101 Henry Adams Street<br>Suite 100<br>San Francisco, CA 94103 | Leased |

| Debtor | Premises Address | Leased/Owned |
|---|---|---|
| The Robert Allen Duralee Group, LLC | 1700 Stutz Drive<br>Suite 38<br>Troy, MI 48064 | Leased |
| The Robert Allen Duralee Group, LLC | 125 Michael Drive<br>Suite 101<br>Syosset, NY 11791 | Leased |
| The Robert Allen Duralee Group, LLC | Washington Design Center<br>1099 14th Street, NW<br>Suite 400<br>Washington, DC 20005 | Leased |
| The Robert Allen Duralee Group, LLC | 49 Wireless Blvd<br>Suite 150<br>Hauppauge, NY 11788 | Leased |
| The Robert Allen Duralee Group, LLC | 647 Hopewell Road<br>Morganton, NC 28655 | Leased |
| The Robert Allen Duralee Group, LLC | 7725 Granger Road<br>Suite A<br>Valley View, OH 44125 | Leased by non-Debtor contract counterparty |

**SCHEDULE 9**

**Location of the Debtors' Assets, Books and Records**

Pursuant to E.D.N.Y. LBR 1007-4(a)(xi), the following lists the locations of the Debtors' significant assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

**Location of the Debtors' Significant Assets**

The Debtors have working capital assets nationwide, with significant assets in Gaffney, South Carolina and Morganton, North Carolina.

**Books and Records**

The Debtors' books and records are located in Hauppauge, New York; Foxboro, Massachusetts; and Morganton, North Carolina.

**Debtors' Assets Outside the United States (if applicable)**

The Debtors do not have assets outside of the United States. The Debtors do hold the stock of the following non-debtor affiliates: Robert Allen Fabrics (Canada) Ltd. and Suburban Home Fabrics (Shanghai) Trading Co., Ltd.

# SCHEDULE 10

## Summary of Legal Actions Against the Debtors

Pursuant to E.D.N.Y. LBR 1007-4(a)(xii), the following is a list of the nature and present status of each material action or proceeding, pending or threatened, against the Debtors or their properties where a judgement against the Debtors or a seizure of their property may be imminent.

| Litigation Matter | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|
| *Source Asia Trading (Shanghai) Co., Ltd., a Wholly Owned Subsidiary of Creative Solutions International, Inc.* **v.** *The Robert Allen Duralee Group LLC* **(Case No. 18-cv-00370)** | 12/28/2018 | U.S. District Court for the Western District of North Carolina, Asheville Division | Breach of Contract | Pending |
| *Bank of America, N.A.* **v.** *Theodore Aufort, Maryann S. Aufort, Mortgage Electronic Registrations Systems Inc., Bank of America, N.A., The Robert Allen Group, and "John Doe" and "Jane Doe"* **(Index No. 2017-620827)** | 11/16/2017 | Supreme Court of New York, County of Suffolk | Foreclosure | Pending |
| *Linda McGreen* **v.** *The Robert Allen Duralee Group, LLC* | 4/30/2018 | N/A | Employment Discrimination | Settlement Agreement in Place – Pending Payment of Settlement Amount |
| *Peterson/Puritan Inc. Superfund Site* **v.** *American Textile a/k/a American Fabrics* | 12/11/2018 | N/A | Comprehensive Environmental Response, Compensation, and Liability Act (a/k/a Superfund) Claim | Threatened – Settlement Demand Received by Debtors on 12/11/2018 |
| *Milberg Factors, Inc.* **v.** *The Robert Allen Duralee Group, Inc.* | 1/15/2019 | N/A | Past Due Invoice Claim | Threatened – Demand Letter Received by Debtors on 1/15/2019 |

| Litigation Matter | Date | Forum | Nature of Action | Status of Case |
|---|---|---|---|---|
| *Next Fabrics LLC v. The Robert Allen Duralee Group, LLC* | 2/1/2019 | N/A | Past Due Invoice Claim | Threatened – Demand Letter Received by Debtors on 2/1/2019 |

## SCHEDULE 11

## Senior Management

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiii), the following provides the names of individuals who comprise the Debtors' existing senior management, a description of their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

| Name/Position | Relevant Experience and Responsibilities | Tenure |
|---|---|---|
| Timothy Boates<br><br>*Chief Restructuring Officer* | Mr. Boates is the Chief Restructuring Officer of the Debtors. As such, Mr. Boates responsibilities include overseeing the day-to-day operations of the Debtors and directing the management of all initiatives related to the Debtors' cost structure, financial operations, and its employees. Mr. Boates is also the President of RAS Management Advisors, LLC, where he has more than nineteen (19) years of experience in restructuring matters, including representing debtors and creditors in bankruptcy and out-of-court restructurings. Mr. Boates experience includes bankruptcy planning and management, negotiating the sale of divisions and whole companies in complex transactions, performing extensive due diligence reviews for financial institutions, and the development of new systems and controls. | Approximately two (2) months |
| Lee Silberman<br><br>*Chief Executive Officer* | Mr. Silberman is the Chief Executive Officer ("CEO") of the Debtors. As such, Mr. Silberman's responsibilities include overseeing the day-to-day operations of the of the Debtors' business. Prior to being named CEO of the Debtors, Mr. Silberman was the Executive Vice President of Duralee Fabrics where he was responsible for strategy and operational planning, information technology, and exports. Mr. Silberman's experience in the industry spans more than forty (40) years. | Approximately two (2) years<br><br>(since the merger of Robert Allen and Duralee) |
| Bill Fuchs<br><br>*Chief Financial Officer* | Mr. Fuchs is the Chief Financial Officer ("CFO") of the Debtors. As such, Mr. Fuchs responsibilities include overseeing all of the Debtors' financial and banking activity and preparation of financial statements and forecasts. Prior to being named CFO of the Debtors, Mr. Fuchs was CFO of Duralee Fabrics and served in that position for seventeen (17) years. | Approximately two (2) years<br><br>(since the merger of Robert Allen and Duralee) |

## SCHEDULE 12

## <u>Payroll</u>

Pursuant to E.D.N.Y. LBR 1007-4(a)(xiv)–(xv), the following provides the estimated amount of weekly payroll to be paid to the Debtors' employees (not including officers and directors) and the estimated amount to be paid to officers, directors, and financial and business consultants retained by the Debtors for the 30-day period following the filing of the chapter 11 petitions.

| Payments to Employees, Officers and Directors | |
|---|---|
| Weekly Payroll to Employees (Not Including Officers and Directors) | Approximately $1,690,421 in aggregate for the 30-day period following the Petition Date |
| Estimated Payments to Officers and Directors | Approximately $44,406 in aggregate for the 30-day period following the Petition Date |

## SCHEDULE 13

### Cash Receipts and Disbursements
### Net Cash Gain or Loss, Unpaid Obligations and Receivables

Pursuant to E.D.N.Y. LBR 1007-4(a)(xvi), the following provides, for the 30-day period following the Petition Date, the estimated cash receipts and disbursements, net cash increase or decrease and obligations and receivables expected to accrue that remain unpaid, other than professional fees, on a consolidated basis.

|  | Estimated Amount |
|---|---|
| Cash Receipts | $7,743,100 |
| Cash Disbursements | $8,599,400 |
| Net Cash Decrease | $856,300 |
| Unpaid Obligations | $0 |
| Unpaid Receivables | $7,060,000 |